John M. Mejía (Utah State Bar No. 13965)
Anna P. Christiansen (Utah Bar No. 17518)
John.mejia@cjlaw.com
Anna.christiansen@cjlaw.com
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 323-5000
Facsimile: (801) 355-3472
*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| A.D. and H.D.,<br><br>Plaintiffs,<br><br>v.<br><br>BLUE CROSS AND BLUE SHIELD OF ILLINOIS, a division of HEALTH CARE SERVICE CORPORATION, a MUTUAL LEGAL RESERVE COMPANY; WOLTERS KLUWER UNITED STATES INC.; and the WOLTERS KLUWER UNITED STATES INC. GROUP HEALTH & WELFARE BENEFITS PLAN,<br><br>Defendants. | **COMPLAINT**<br><br>Case No. 1:26-cv-13859<br><br>Judge ______________ |

Plaintiffs A.D. and H.D., by and through counsel of record, hereby complain against Defendants, alleging in the totality and alternatively as follows:

## INTRODUCTION

A.D. was a participant in a self-funded health plan sponsored by her employer, Wolters Kluwer United States Inc. She enrolled her dependent child, H.D., as a beneficiary under the plan. In November 2024, H.D. began receiving mental health treatment from Telos U, LLC ("Telos"), a licensed behavioral health program located in Orem, Utah. H.D. initially received care at Telos

in a partial hospitalization program ("PHP") before being stepped down to Telos's intensive outpatient program ("IOP"). After authorizing H.D.'s care at Telos through February 11, 2025, Defendant Blue Cross and Blue Shield of Illinois ("BCBSIL") denied payment for H.D.'s treatment from February 12, 2025 through August 27, 2025, claiming that treatment, both at the PHP and IOP levels of care, was not medically necessary. BCBSIL's denial caused Plaintiffs to incur more than $300,000 in billed mental health care treatment expenses, of which they paid a substantial portion.

Plaintiffs appealed the denials for both the PHP and IOP care. BCBSIL upheld its decision denying the PHP care using boilerplate reasoning. On the other hand, BCBSIL has so far failed to issue any decision regarding Plaintiffs' appeal of the IOP denial. Because Defendants' denials were inconsistent with the terms of the plan and the requirements of ERISA and federal parity law, Plaintiffs bring this action to recover benefits due under the Plan and to obtain all other appropriate relief.

## PARTIES, JURISDICTION, AND VENUE

1. This case involves mental health treatment and other confidential medical and mental health information. Using Plaintiffs' full names and surnames would tend to render them identifiable and would intrude upon private health care matters, including matters protected by HIPAA. For these reasons, Plaintiffs are contemporaneously filing a motion for leave to proceed under pseudonyms.

2. Plaintiffs incorporate herein the medical records and other claim-related documentation previously exchanged between them and Defendants.

3. Plaintiffs reside in Cook County, Illinois.

4. A.D. is H.D.'s mother.

5. Through her employment with Defendant Wolters Kluwer United States Inc. ("Wolters Kluwer"), A.D. was a participant in the Blue Cross Blue Shield PPO coverage option (Group No. 759645) of the Wolters Kluwer United States Inc. Health Plan, a component of the Wolters Kluwer United States Inc. Group Health & Welfare Benefits Plan (collectively, the "Plan"). H.D. was A.D.'s dependent and, at all times relevant hereto, a beneficiary under the Plan.

6. The Plan is a welfare benefits plan under 29 U.S.C. § 1001 *et seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

7. Wolters Kluwer is the sponsor of the Plan and, upon information and belief, the Plan Administrator of the Plan.

8. The Plan is self-funded by Wolters Kluwer, which entered into an administrative services contract with BCBSIL to process claims under the Plan.

9. Defendant Blue Cross and Blue Shield of Illinois ("BCBSIL"), an Illinois corporation, is a division of Health Care Service Corporation, a Mutual Legal Reserve Company, and an independent licensee of the Blue Cross and Blue Shield Association.

10. Wolters Kluwer contracted with BCBSIL to handle the day-to-day administration of the Plan, including making benefit decisions, determining and paying claims, conducting preauthorization and medical necessity review through its mental health unit, and processing benefit claims and appeals.

11. BCBSIL exercised discretionary authority and control over the determination of Plaintiffs' claims and is a fiduciary of the Plan under ERISA.

12. Plaintiffs bring this action to obtain an order requiring Defendants to pay or reimburse the expenses they incurred for H.D.'s treatment at Telos.

13. Plaintiffs seek benefits due under the terms of the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B); in the alternative for appropriate equitable relief under 29 U.S.C. § 1132(a)(3) based on Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"); as well as an award of pre-judgment interest; and an award of fees and costs pursuant to 29 U.S.C. § 1132(g).

14. This Court has jurisdiction over this case pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

15. Venue is proper under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(c) because Plaintiffs reside in this District, the Plan is administered in this District, and BCBSIL's breaches occurred in this District. ERISA's nationwide service-of-process and venue provisions further support venue in this Court.

## FACTUAL ALLEGATIONS

### *The Plan*

16. Wolters Kluwer issued a Medical Plan Summary Plan Description, effective January 1, 2024, for the Plan (the "SPD").[1]

17. Upon information and belief, the SPD, together with the governing plan document, any amendments, and the administrative services agreement between Wolters Kluwer and BCBSIL, constitute the governing documents of the Plan.

18. The Plan covers treatment for mental illness, including partial hospitalization treatment and intensive outpatient treatment.

19. The Plan defines "Partial Hospitalization Treatment Program" to mean:

> Claims administrator–approved planned program of a hospital, residential treatment center or substance abuse treatment facility for

---

[1]Unless otherwise noted, the information supporting these allegations is contained within the Administrative Record. The Administrative Record is incorporated herein by reference.

> the treatment of mental illness or substance abuse rehabilitation treatment in which patients spend days or nights.[2]

20. The Plan defines "Provider" to mean "[a]ny health care facility (for example, a hospital or skilled nursing facility) or person (for example, a physician or dentist) or entity duly licensed to render covered services to you."[3]

21. The Plan defines "Covered Service" to mean "[a] service and supply specified in this SPD for which benefits will be provided."[4]

22. The Plan defines "Medically Necessary/Medical Necessity" as follows:

> This means that a specific medical, health care, supply or hospital service is required for the treatment or management of a medical symptom or condition, and that the service, supply or care provided is the most efficient and economical service which can safely be provided. . . . Hospitalization or other health care is not medically necessary when, applying the definition of "medically necessary" to the circumstances surrounding the hospitalization or other health care, it is determined that the medical services provided did not require an acute hospital inpatient (overnight) setting but could have been provided in a physician's office, the outpatient department of a hospital, or some other setting without adversely affecting the patient's condition.[5]

23. The Plan purports to state certain preauthorization requirements for mental health treatment:

> **Partial Hospitalization Treatment Program Preauthorization Review.** In order to receive maximum benefits under this Plan, you must preauthorize your treatment of mental illness or substance abuse rehabilitation treatment by calling the mental health unit. This call must be made at least one day prior to the scheduling of the partial hospitalization treatment program. The mental health unit will obtain information regarding the service(s) and may discuss proposed treatment with your behavioral health provider.[6]

---

[2] SPD, p. 146.
[3] SPD, p. 149.
[4] SPD, p. 131.
[5] SPD, p. 142.
[6] SPD, p. 78.

24. The Plan further provides:

> Upon completion of the preauthorization or emergency mental illness or substance abuse review, the mental health unit will send you a letter confirming that you or your representative called the mental health unit. A letter assigning a length of service or length of stay will be sent to your behavioral health provider and/or the hospital. An extension of the length of stay/service will be based solely on whether continued inpatient care or other health care service is medically necessary as determined by the mental health unit.[7]

25. The Plan also states that when the mental health unit determines services are not medically necessary, the notification "will specify the dates, services, or supplies that are not considered medically necessary."[8]

26. The Plan's general preauthorization provisions state that a failure to obtain preauthorization results in "additional steps, benefit reductions, and a $250 penalty."[9]

27. The Plan does not provide that a denial of preauthorization or concurrent review, standing alone, eliminates all benefits for otherwise covered and medically necessary care.[10]

28. The Plan states that it does not cover "[h]ospitalization or other health care services and supplies" that are not "medically necessary."[11]

29. The Plan's claims and appeals procedures provide that a denial notice will contain "[t]he specific reason(s) for the denial," "[t]he Plan provisions on which the denial was based," and "[a]ny additional material or information you may need to submit to complete the claim."[12]

---

[7] SPD, p. 78.
[8] SPD, p. 79.
[9] SPD, p. 72.
[10] *See generally*, SPD, p. 72.
[11] SPD, p. 65.
[12] SPD, p. 105.

***H.D.'s Medical Issues and Treatment***

30. H.D. had been diagnosed with several serious mental health conditions described in the DSM-5, including major depressive disorder, single episode, severe (F32.2); attention-deficit/hyperactivity disorder, combined presentation (F90.2); and autism spectrum disorder (F84.0).

31. Prior to admission at Telos, H.D. had a history of impulsive actions, technology addiction, poor daily living skills, and isolation, indicating a high mental health risk. H.D suffered from severe anxiety, depression, and mood dysregulation. H.D.'s disorders and behaviors were severe enough that mental health professionals determined that receiving treatment at an inpatient level was necessary.

32. In September 2024, H.D. was admitted to Confluence Behavioral Health, a therapeutic residential program for young adults in Thetford, Vermont. While there, H.D.'s treatment team referred H.D. to the Hanover Center for Cognitive Behavioral Therapies for a comprehensive psychological evaluation in September and October 2024.

33. On November 12, 2024, H.D. was admitted to Telos.

34. Telos is a licensed behavioral health treatment program located in Orem, Utah, that provides mental health treatment to young adults, including at partial hospitalization and intensive outpatient levels of care.

35. Telos's programs are less intensive than acute inpatient hospitalization but more intensive than routine outpatient therapy, placing them within an intermediate level of behavioral health care.

36. H.D. initially received treatment from Telos at the PHP level of care.

37. BCBSIL authorized H.D.'s treatment at Telos through February 11, 2025.

38. H.D. continued to receive care from Telos at the PHP level of care from February 12, 2025 through June 1, 2025.

39. On June 2, 2025, H.D. stepped down to Telos's IOP level of care, receiving treatment at that level until being discharged on August 28, 2025.

40. Throughout the denied period, H.D. exhibited persistent emotional dysregulation, rigid thinking, poor insight, and significant difficulty responding appropriately to boundaries, authority figures, and therapeutic interventions. Providers repeatedly documented that H.D. became hostile, argumentative, and inflexible when confronted with limits, frequently demanding immediate independence while demonstrating ongoing deficits in emotional regulation, executive functioning, and problem-solving.

41. H.D.'s treatment records reflect chronic anxiety, hopelessness, and maladaptive interpersonal patterns that substantially impaired H.S.'s functioning. On March 18, 2025, H.D. reported feeling "hopeless" and "powerless" regarding school and ability to meet expectations, became visibly emotional during therapy, and disclosed longstanding beliefs about not being able to ever satisfy parental expectations. Providers identified these issues as deeply rooted and requiring ongoing therapeutic intervention.

42. H.D. continued to struggle with family conflict, distorted relational dynamics, and unhealthy coping mechanisms throughout the course of treatment. Therapists documented that H.D. frequently adopted a "victim" role within family interactions, blamed others for difficulties, and escalated into hostility and blame-shifting on perceiving that others were not meeting expectations or providing desired outcomes. Family therapy remained necessary to address these entrenched patterns and improve H.D.'s ability to communicate effectively with H.D.'s parents.

43. Despite periods of progress, H.D. demonstrated ongoing functional impairments that interfered with independent living. Treatment records document repeated difficulties complying with program expectations, completing daily responsibilities, attending scheduled activities, turning in technology when required, maintaining personal hygiene, and following through on academic and vocational obligations. Providers further noted that H.D. had a history of dropping out of college courses, leaving employment opportunities prematurely, struggling to complete activities of daily living, and isolating from others.

44. H.D. also exhibited persistent behavioral symptoms requiring continued structure and supervision. Throughout the denied period, H.D. repeatedly refused or avoided therapeutic programming, including numerous instances of refusing to attend group therapy, declining readiness-skills programming, isolating, disregarding staff directives, violating program rules, engaging in verbal outbursts, displaying disrespectful conduct toward staff and peers, and expressing a lack of care about the consequences of actions. These behaviors demonstrated that H.D. had not yet developed the emotional regulation and independent functioning necessary for a less intensive level of care.

45. H.D.'s discharge records documented ongoing secrecy from parents, persistent rigidity, anxiety-driven mental inflexibility, difficulties accepting feedback, struggles completing activities of daily living, a tendency to isolate, and a history of major conflict with family members.

46. All these records confirm that continued treatment throughout 2025 at Telos addressed serious and ongoing behavioral health conditions that impaired H.D.'s social, educational, familial, and independent functioning.

47. H.D.'s treatment at Telos was medically necessary under the terms of the Plan and generally accepted standards of care.

***Defendants Deny Coverage for H.D.'s PHP Treatment***

48. In a letter dated August 20, 2025 (the "PHP Denial Letter"), BCBSIL informed Plaintiffs that their request for partial hospitalization services for H.D. at Telos from February 19, 2025 through June 30, 2025, was "NOT APPROVED."

49. The PHP Denial Letter stated:

> The service requested has not been approved. . . . Based on the information provided, you did not meet medical necessity guidelines for the following reasons: You were not a danger to yourself. You were not a danger to others. You were medically stable. You had coping skills. You did not need partial hospital on the days in question. Criteria Referenced: MCG care guidelines Partial Hospital Behavioral Health Level of Care (Adult) 28th Edition Alternate Level of Care Recommended: Mental Health Intensive Outpatient Last Covered Day: 2/11/25

50. BCBSIL issued the PHP Denial Letter months after the services had been rendered and while H.D. was still in treatment at Telos.

51. Telos submitted claims for H.D.'s PHP treatment to BCBSIL.

52. In an Explanation of Benefits processed on August 21, 2025 (the "PHP EOB"), BCBSIL denied six claims for H.D.'s PHP treatment totaling $202,400, assigning $0 in "Health Plan Responsibility" to each claim and thereby wholly denying payment for the services.

53. As the sole reason for the denial of each of claim, the PHP EOB stated: "The medical/surgical advisor was contacted for pre-certification prior to the start of your treatment. However, your pre-certification request was not approved. No payment can be made."

54. The PHP EOB did not cite any Plan provision, did not explain why H.D.'s treatment was not medically necessary, and described H.D.'s mental health treatment as having been reviewed by a "medical/surgical advisor."

***Defendants Deny Coverage for H.D.'s IOP Treatment***

55. In a letter dated September 29, 2025 (the "IOP Denial Letter"), BCBSIL informed H.D. that Plaintiffs' request for intensive outpatient services at Telos from June 2, 2025 through August 27, 2025, was "NOT APPROVED."

56. The IOP Denial Letter stated:

> The service requested has not been approved. . . . Based on the information provided, you did not meet medical necessity guidelines for the following reasons: Your medical issues were stable. You did not want to hurt yourself nor [*sic*] others. You took part in all your treatment. You had other resources available. Criteria Referenced: MCG Care Guidelines Intensive Outpatient Program Behavioral Health Level of Care (Adult) 29th Edition Alternate Level of Care Recommended: Mental Health Outpatient Services Last Covered Day: None.

57. BCBSIL issued the IOP Denial Letter more than one month after the services were rendered and after H.D. had completed treatment at Telos.

58. Telos submitted claims for H.D.'s IOP treatment to BCBSIL.

59. In an Explanation of Benefits processed on October 1, 2025 (the "IOP EOB"), BCBSIL denied twelve claims for H.D.'s IOP treatment totaling $93,600, assigning $0 in "Health Plan Responsibility" to each claim and thereby wholly denying payment for the services.

60. As the sole reason for the denial of each of those claims, the IOP EOB stated: "The medical/surgical advisor was contacted for pre-certification prior to the start of your treatment. However, your pre-certification request was not approved. No payment can be made."

61. The IOP EOB did not cite any Plan provision, did not explain why H.D.'s treatment was not medically necessary, and described H.D.'s mental health treatment as having been reviewed by a "medical/surgical advisor."

62. Further, the IOP EOB failed to explain why H.D.'s intensive outpatient treatment was denied, even though BCBSIL later identified intensive outpatient treatment as the appropriate level of care for H.D. in the PHP Denial Letter.

***Plaintiffs Appeal the PHP and IOP Denials***

63. On November 6, 2025, Plaintiffs, through their authorized representative, submitted by email to BCBSIL a Level One Member Appeal of the PHP denial and a separate Level One Member Appeal of the IOP denial (together, the "Level One Appeals").

64. Among other things, the Level One Appeals:

a. Explained that H.D.'s treatment at Telos was a covered benefit and that Telos met the Plan's definitions and programmatic requirements for the levels of care provided;

b. Submitted H.D.'s medical records from Telos documenting H.D.'s symptoms and need for continued treatment;

c. Requested that BCBSIL assign a reviewer board certified in adult psychiatry with experience treating major depressive disorder, ADHD, autism spectrum disorder, and other high-risk behaviors in an intermediate behavioral health setting;

d. Requested that a person trained in the MHPAEA provide input to ensure that the Plan was being administered in compliance with that law;

e. Requested specific references to the clinical information in the Telos records supporting BCBSIL's determination;

f. Requested a copy of all documents related to the initial determination and the appeal determination, including the reviewer's name, credentials, experience, and case notes or report as well as a copy of the MCG guidelines BCBSIL used; and

g. Reminded BCBSIL of its obligations under ERISA to provide a full and fair review and a written decision setting forth the specific reasons for any adverse determination, reference to the specific Plan provisions on which it is based, and a description of any additional information necessary to perfect the claim.

65. On or about December 11, 2025, BCBSIL advised that it had received the Level One Appeals but that they were "not legible." Plaintiffs' representative resubmitted the Level One Appeals that same day.

66. On or about December 29, 2025, Plaintiffs' representative called BCBSIL to inquire about the status of the Level One Appeals. After remaining on hold for more than three hours, Plaintiffs' representative spoke with a BCBSIL representative, who stated that none of the claim numbers, appeal identification numbers, or authorization numbers provided were valid. When Plaintiffs' representative requested to speak with a supervisor, the BCBSIL representative disconnected the call. Later that day, a second BCBSIL representative advised that the appeals were pending and that supporting documentation had been uploaded.

67. On or about February 6, 2026, a BCBSIL representative advised that BCBSIL had received some documents but not the complete appeals and that the documents received were not legible. Plaintiffs' representative again resubmitted both Level One Appeals.

68. On or about February 19, 2026, a BCBSIL representative confirmed to Plaintiffs' representative that an appeal had been created on February 17, 2026, that it was under review, and that BCBSIL's deadline to issue a decision was March 15, 2026.

***Defendants Deny the PHP Appeal***

69. In a letter dated February 24, 2026 (the "PHP Appeal Denial Letter"), BCBSIL stated that it had received the PHP appeal on February 13, 2026 and that "the appeal request has been denied."

70. The PHP Appeal Denial Letter identified the services at issue as "Mental Health Partial Hospital/Day Treatment" rendered between February 12, 2025, and June 30, 2025. The PHP Appeal Denial Letter further described the basis for BCBSIL's initial denial as follows:

> Certification/approval is required from mental health advisor for the treatment of mental health or substance abuse conditions benefit payment denied because mental health advisor was contacted but did not approve the treatment received., Medical/Surgical advisor contacted but did not approve service/treatment.

71. The PHP Appeal Denial Letter identified the "Initial Decision Date" as October 1, 2025, and the "Claim Amount" as $7,200. However, those details corresponded to claims for H.D.'s IOP treatment at Telos rather than the PHP claims under appeal, indicating that BCBSIL relied on information pertaining to a different claim set.

72. The PHP Appeal Denial Letter stated as follows:

> **Member Summary:** Per the medical necessity provision of your benefit plan, a medical necessity review has been completed. Based on the information provided, you did not meet medical necessity guidelines for the following reasons: You did not want to hurt yourself or others. You were able to go to school. You were also able to work part-time. You had a good visit home. You did not have major medical issues. You could have been treated in intensive outpatient.
>
> Criteria Referenced: MCG Care Guidelines Partial Hospital Program Behavioral Health Level of Care (Adult) 28th Edition
>
> Alternate Level of Care Recommended: Mental Health Intensive Outpatient Services
>
> Last Covered Day: 2/11/2025
>
> **Procedure(s) Reviewed:** H0035 - Mental health partial hospitalization, treatment, less than 24 hours.
>
> **This decision is based on:** MCG 29th Edition: May 17, 2025 - present Partial Hospital Program Behavioral Health Level of Care (Adult) 28th Edition

73. The PHP Appeal Denial Letter quoted the following Plan language:

> See the "Exclusions-What is Not Covered" portion of your Benefit Booklet "Expenses for the following are not covered under your benefit program: — Hospitalization, services and supplies which are not Medically Necessary. No benefits will be provided for services which are not, in the reasonable judgment of the Claim Administrator, Medically Necessary. Medically Necessary means that a specific medical, health care or Hospital service is required, in the reasonable medical judgment of the Claim Administrator, for the treatment or management of a medical symptom or condition and that the service or care provided is the most efficient and economical service which can safely be provided. Hospitalization is not Medically Necessary when, in the reasonable medical judgment of the Claim Administrator, the medical services provided did not require an acute Hospital Inpatient (overnight) setting, but could have been provided in a Physician's office, the Outpatient department of a Hospital or some other setting without adversely affecting the patient's condition."

74. The PHP Appeal Denial Letter further stated: "There was one internal appeal available which has now been exhausted."

75. The PHP Appeal Denial Letter did not identify the reviewing physician by name, did not engage with the medical records or arguments presented in Plaintiffs' appeal, did not cite any clinical information from H.D.'s Telos records, and did not provide the reviewer notes, MCG criteria, or other documents Plaintiffs requested.

76. The PHP Appeal Denial Letter purported to evaluate H.D.'s treatment through June 30, 2025 under PHP criteria even though H.D. was receiving IOP-level care at Telos during June 2025, the very level of care the letter identified as appropriate.

77. The PHP Appeal Denial Letter applied the 28th and 29th editions of the MCG guidelines to dates of service from February 12, 2025 through June 30, 2025, without explaining which edition applied to which dates of service.

78. The PHP Appeal Denial Letter did not address Plaintiffs' request for a MHPAEA analysis.

***Plaintiffs Request External Review of the PHP Denial***

79. On June 26, 2026, Plaintiffs submitted a request for external review of the PHP Appeal Denial Letter to BCBSIL and requested that BCBSIL refer the appeal to an Independent Review Organization.

80. The external review was assigned to Dane Street, which received Plaintiffs' request on July 6, 2026.

81. In a letter dated August 11, 2026 (the "IRO Denial Letter"), Dane Street upheld BCBSIL's PHP denial.

82. The IRO Denial Letter characterized Plaintiffs' PHP claim as a "request . . . for the coverage of a mental health partial hospitalization for the dates 02/12/2025 – 06/30/2025."

83. The IRO Denial Letter concluded that H.D.'s "medical records d[id] not establish that the requested services were medically necessary.

84. Like the PHP Appeal Denial Letter, the IRO Denial Letter purported to evaluate H.D.'s treatment through June 30, 2025 under PHP criteria even though H.D. was receiving IOP-level care at Telos during June 2025, the same level of care the letter identified as appropriate.

***Defendants fail to decide the IOP appeal***

85. BCBSIL never issued a decision on Plaintiffs' Level One Appeal of the IOP denial.

86. On February 19, 2026, a BCBSIL representative advised Plaintiffs' representative that BCBSIL's decision on the appeal was due by March 15, 2026. BCBSIL did not issue a decision.

87. In about August 2026, after BCBSIL had failed to respond to the appeal for more than nine months, A.D. submitted a written complaint to Wolters Kluwer, the Plan sponsor, requesting that it intervene and require BCBSIL to process the IOP appeal in accordance with the terms of the Plan.

88. On or about September 1, 2026, a Wolters Kluwer representative advised that the matter had been escalated to the Plan Administrator. Neither Wolters Kluwer nor BCBSIL has since issued a decision on the IOP appeal.

89. Defendants failed to decide the IOP appeal within the time required by the Plan and 29 C.F.R. § 2560.503-1(i).

90. Because Defendants failed to establish or follow claims procedures consistent with ERISA, Plaintiffs are deemed to have exhausted the administrative remedies available under the Plan pursuant to 29 C.F.R. § 2560.503-1(l), and Defendants' determinations are entitled to no deference.

***Exhaustion and Damages***

91. Plaintiffs have exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA, or such exhaustion is deemed satisfied or excused.

92. The denial by BCBSIL and the Plan of benefits for H.D.'s treatment at Telos from February 12, 2025, through August 27, 2025 caused Plaintiffs to incur more than $300,000 in billed mental health treatment expenses, of which they paid a substantial portion.

93. After the denials, Plaintiffs had no reasonable alternative but to bring this action to enforce their right to benefits due under the Plan and to obtain reimbursement of expenses owed under the Plan, ERISA, and/or under the MHPAEA amendments to ERISA.

94. Plaintiffs thereafter retained the undersigned to pursue their rights and remedies.

95. Plaintiffs do not seek double recovery.

## FIRST CAUSE OF ACTION

***Claim for Recovery of Benefits – 29 U.S.C. § 1132(a)(1)(B)***

96. All allegations of this Complaint are incorporated by reference as if set forth herein.

97. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBSIL, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. *See* 29 U.S.C. § 1104(a)(1).

98. BCBSIL and the Plan wrongfully denied benefits for H.D.'s treatment in violation of the terms of the Plan, which provides coverage for the medically necessary treatment of mental illness, including partial hospitalization and intensive outpatient treatment.

99. H.D.'s treatment at Telos, at both the PHP and IOP levels of care, was medically necessary under the Plan's terms. Defendants' contrary determinations disregarded the medical records and opinions of H.D.'s treating providers, applied criteria more restrictive than the Plan's terms and generally accepted standards of care, and relied on conclusory statements unsupported by the administrative record.

100. Defendants denied benefits for H.D.'s IOP treatment, the same level of care BCBSIL identified as appropriate, without making a medical-necessity determination. Defendants never issued a decision on Plaintiffs' appeal of that denial.

101. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and engage in a meaningful dialogue with claimants in the pre-litigation appeal process. *See* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1.

102. BCBSIL and the Plan breached their fiduciary duties to Plaintiffs when they failed to comply with their obligations under 29 U.S.C. § 1104 and 29 U.S.C. § 1133, including their duties to act solely in the interests of participants and beneficiaries, provide requested claim-related

documents and information, timely decide Plaintiffs' appeals, and afford Plaintiffs a full and fair review of H.D.'s claims.

103. BCBSIL's and the Plan's denial of benefits for H.D.'s treatment violated the terms of the Plan, whether construed as written or as reformed as required or permitted by ERISA.

## SECOND CAUSE OF ACTION

### *Violation of the Mental Health Parity and Addiction Equity Act*

104. All allegations of this Complaint are incorporated by reference as if set forth herein.

105. The MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and the MHPAEA. The obligation to comply with both ERISA and the MHPAEA is part of Defendants' fiduciary duties.

106. Generally speaking, the MHPAEA requires ERISA plans to provide no less generous coverage for the treatment of mental health and substance use disorders than they provide for the treatment of medical/surgical disorders.

107. The MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical/surgical benefits and makes illegal separate treatment limitations that are applicable only to mental health or substance use disorder benefits. *See* 29 U.S.C. § 1185a(a)(3)(A)(ii).

108. Impermissible nonquantitative treatment limitations ("NQTLs") under the MHPAEA include, but are not limited to, medical management standards that limit or exclude benefits based on medical necessity, as well as prior authorization and concurrent review requirements that are applied more stringently to mental health or substance use disorder benefits than to medical/surgical benefits. *See* 29 C.F.R. § 2590.712(c)(4).

109. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits Defendants denied for H.D.'s treatment at Telos include sub-acute and intermediate levels of care such as skilled nursing facilities, inpatient rehabilitation facilities, home health care, and outpatient rehabilitation services.

110. The Plan's definition of medical necessity for hospitalization measures care against whether it "require[d] an acute hospital inpatient (overnight) setting." Upon information and belief, Defendants applied this acute-care standard, as well as acute-oriented criteria such as whether H.D. presented an imminent risk of harm to self or others, to deny coverage for intermediate-level mental health treatment, while failing to apply comparable acute-care requirements to intermediate-level medical/surgical treatment.

111. Upon information and belief, Defendants used the MCG Behavioral Health Care guidelines to deny H.D.'s PHP treatment. Those criteria are more restrictive than generally accepted standards of care for partial hospitalization and, upon information and belief, are more stringent than the criteria Defendants use to evaluate the medical necessity of analogous intermediate-level medical/surgical treatment.

112. Upon information and belief, Defendants denied all benefits for H.D.'s PHP and IOP treatment based on the outcome of preauthorization and concurrent review, while the Plan imposes only a benefit reduction and a $250 penalty for analogous medical/surgical services that are not preauthorized.

113. Upon information and belief, Defendants' denial of coverage also violated the MHPAEA in application or effect. Because Defendants declined to produce the documents and materials requested by Plaintiffs, further discovery is needed to resolve this aspect of Plaintiffs' claims.

114. Defendants are in violation of 29 C.F.R. § 2590.712(c)(4) because the terms of the Plan, as written or in operation, use processes, strategies, evidentiary standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied than, the processes, strategies, evidentiary standards, or other factors used to limit coverage for medical/surgical treatment in the same classification.

115. Plaintiffs expressly asked BCBSIL to have a person trained in the MHPAEA review their claims to ensure the Plan was being administered in compliance with the statute. BCBSIL failed or declined to do so and failed to even address the MHPAEA in the PHP Appeal Denial Letter.

116. The MHPAEA violations by Defendants are breaches of fiduciary duty and give Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. § 1132(a)(3), including, but not limited to:

a. A declaration that the actions of Defendants violate the MHPAEA;

b. An injunction ordering Defendants to cease violating the MHPAEA and requiring compliance with the statute;

c. An Order requiring the reformation of the terms of the Plan and the medical necessity criteria used by Defendants to interpret and apply the terms of the Plan to ensure compliance with the MHPAEA;

d. An Order requiring disgorgement of funds obtained or retained by Defendants as a result of their violations of the MHPAEA;

e. An Order requiring an accounting by Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of Defendants' violations of the MHPAEA;

f. An Order based on the equitable remedy of surcharge requiring Defendants to provide payment to Plaintiffs as make-whole relief for their loss;

g. An Order equitably estopping Defendants from denying Plaintiffs' claims in violation of the MHPAEA; and

h. An Order providing restitution from Defendants to Plaintiffs for their loss arising out of Defendants' violations of the MHPAEA and unjust enrichment.

117. In addition, Plaintiffs are entitled to an award of pre-judgment interest and attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

**WHEREFORE**, Plaintiffs seek relief as follows:

1. Judgment in the total amount Plaintiffs incurred for all of H.D.'s treatment at Telos;
2. Pre- and post-judgment interest to the date of payment;
3. Appropriate equitable relief under 29 U.S.C. § 1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;
4. Recoverable fees and costs incurred pursuant to 29 U.S.C. § 1132(g); and
5. For such further relief as the Court deems just and proper.

DATED this 6th day of November, 2026.

CHRISTENSEN & JENSEN, P.C.

By: *\/s/ John M Mejía*
John M. Mejía
Anna P. Christiansen
Attorney for Plaintiffs